EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------------------------------------x

SURVEY SAMPLING INTERNATIONAL, LLC,    :   ECF Case

          Plaintiff,        :   Civil Action No.

  - against -            :

RICHARD ODELLO,          :

          Defendant.    :

-----------------------------------------------------------x

## COMPLAINT

Plaintiff Survey Sampling International, LLC ("SSI" or the "Company"), by and through its undersigned counsel, files its Complaint against Defendant Richard Odello ("Odello" or "Defendant"), and alleges as follows:

### NATURE OF THE ACTION

1.    This action arises out of Odello's intentional breach of his written agreement with SSI not to accept employment with a competitor of SSI within one (1) year of his departure from SSI -- a competitor that Odello specifically agreed that he would not be allowed to work for in the event he departed from SSI.  Nevertheless, in deliberate contradiction to the terms of his agreement, Odello voluntarily resigned from SSI and immediately began working for Lucid, LLC ("Lucid"), a company in direct competition with SSI, and in a high-level sales position comparable to the one he walked away from at SSI.

2.    As a direct result of Odello's unlawful conduct, SSI seeks, among other things, an injunction prohibiting Odello from continuing to violate his obligations to SSI, damages for Odello's wrongful conduct, and the attorneys' fees and costs that SSI has incurred and will incur in prosecuting this action.

### THE PARTIES


EXHIBIT ____A____
4

3.      SSI is a Delaware limited liability corporation that is based in Shelton, Connecticut.  SSI's sole member is SSI Holdings, LLC, a Delaware limited liability company.

4.      Upon information and belief, Odello is an individual who resides at 6250 Oakdale Ave. Woodland Hills, CA 91367, and may be served with process at the same address.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.      Venue is proper in this judicial district because: (a) Odello explicitly agreed that any dispute or claim arising out of or resulting from his employment agreement with SSI (the basis of this lawsuit) would be subject to the exclusive jurisdiction and venue of the state or federal courts located in Fairfield County, Connecticut, (b) SSI's principal place of business is located in this district, and (c) a substantial part of the events out of which SSI's claims arise occurred in this district.

## FACTUAL BACKGROUND

### I.      SSI's Worldwide Business

7.      SSI is the premier global provider of data solutions and technology for consumer and business-to-business survey research.  With its world headquarters based in Shelton, Connecticut, SSI's 3,600+ employees operate out of 30 offices in 21 different countries.  Since its inception, SSI has generated surveys that have reached respondents in 100+ countries via Internet, telephone, mobile/wireless and mixed-access offerings.

8.      As a result of SSI's strong reputation, training, and marketing efforts, it has forged long-term relationships with over 2,500 clients across the globe.

5

9.      These relationships are based on confidence in the quality of the services offered and an increased recognition of, and familiarity with, SSI as a provider of quality services.

10.     SSI's goodwill is critical to its success and includes repeat business with its established clients.

11.     SSI's goodwill is also the result of extensive advertising and well-deserved reputation for guarding the confidentiality of the information that it has gathered, analyzed, and developed over the period of its many years of existence.

12.     Because this goodwill and confidential information is so important to its business, SSI has made extensive efforts to protect these assets and has implemented specific policies and practices established to protect its confidential information.

13.     In addition to the identity of its many clients, SSI has extensive files on its clients' preferences, needs, and particular requirements.

14.     This information is not available to the public and is considered a closely-guarded trade secret by SSI.

15.     Only authorized employees are given access to such information.

16.     Through the use of its confidential information and goodwill, SSI has been able to develop the trade and the patronage of its clients.

**II.     Odello's High-Level Roles and Responsibilities with SSI**

17.     Odello first began working for SSI in October 2008 as an "Panel Consultant," operating out of SSI's Los Angeles office.  Prior to joining SSI, Odello had no experience in the survey research industry.  As a condition of his employment with SSI in 2008, Odello executed Confidentiality and Noncompetition Agreement.

18.     Over the years, however, Odello steadily rose through SSI's ranks, increasing his influence at the Company and eventually assuming high-level management roles and

responsibilities for SSI's national and international sales efforts. In October 2008, Mr. Odello was promoted to "Account Executive." In April 2009, Mr. Odello was promoted to "Account Manager." In January 2011, Mr. Odello was promoted to "Regional Manager, Business Development." In October 2011, Mr. Odello was promoted to "Business Development Consultant." In January of 2012, Mr. Odello was promoted to "Sr. Account Executive Leader/Director, Sales." In 2013, Mr. Odello was promoted to "VP of Sales."

19.     In his VP of Sales role, Odello serviced several national SSI accounts, as well as SSI clients across the United States, including clients in: Texas, New Mexico, Utah, Colorado, Arizona, Oregon, Montana, Nevada, Washington, California, and Virginia/Washington D.C.

20.     Odello's responsibilities extended abroad as well: (a) he directly oversaw SSI clients and SSI employees based in Mexico and Brazil; (b) he worked closely with numerous SSI project managers and managing directors located in territories overseas, including India, China, and the Philippines; and (c) co-managed one of SSI's largest clients with SSI's manager for the United Kingdom.

21.     Respected as a top performer and key member of SSI's upper-management, Odello also oversaw several critical, company-wide initiatives. For example, in January 2016, Odello served as a primary point person for one of SSI's high-profile mergers, where he directly supervised the onboarding over one-hundred (100) new SSI employees.

22.     As of May 2016, Odello: (a) controlled $40-$50 million in annual revenue; (b) oversaw six (6) direct reports and fifteen (15) indirect reports; (c) compensated with a six-figure salary; and (d) and commonly known within SSI as the "Lead of the West." Even in a company as large as SSI, Odello ultimately became a well-known figure throughout virtually all of SSI's global offices.

7

23.     Suffice it to say, by the time Odello departed from SSI, he was a critical member of SSI's upper-management, with direct involvement in a wide variety of SSI initiatives and efforts across the United States and abroad.

24.     In conjunction with his steady promotions and central role in SSI's national/international sales, it was necessary for Odello to work regularly with a variety of individuals based out SSI's world headquarters in Shelton, Connecticut, including:

(a)     Routine trips to Connecticut (six (6) times since January 2015) to attend high-level, management meetings and to receive continued training, including, but not limited to, attendance at SSI's three-day global sales kick-off meeting in January 2016 and SSI's two-day sales leadership team meeting in April 2016, both of which were only attended by SSI's most senior sales people;

(b)     Regular interactions with SSI's Chief Executive Officer (based in Connecticut) concerning a variety of company-wide initiatives and strategies, both nationally and internationally;

(c)     Regular interactions with SSI's General Counsel (based in Connecticut) and Human Resources Director (also based in Connecticut) concerning various topics, including, but not limited to, employee performance and compensation matters, as well as client contract negotiations;

(d)     Regular interactions with SSI's Talent Acquisition Associate (based in Connecticut) on recruitment initiatives;

(e)     Regular interactions with Chief Financial Officer and SSI's VP Business Planning and Financial Analysis (both located in Shelton) to discuss client pricing models and rebates;

(f)     All of Mr. Odello's interactions with SSI's Finance Department and IT Engineering Department, took place with individuals in Connecticut because each department was based solely in SSI's headquarters in Shelton;

(g)     Through and including at least January 28, 2016, all of Mr. Odello's interactions with the Marketing Department took place with individuals in Connecticut because each department was based solely in SSI's headquarters in Shelton; and

(h)     Since 2013, Mr. Odello's direct supervisor was always located in Connecticut.

25.     In order to fulfill his high-level responsibilities, SSI also gave Odello access to its proprietary and confidential databases of client information, as well as trade secrets regarding client preferences and pricing information.  This confidential information includes, but is not limited to:

(a)     SSI's confidential pricing information, including margins, underlying product costs, and ability to offer discounts;

(b)     SSI's confidential national and international market strategies, including confidential target markets;

(c)     SSI's confidential business relationships, including areas of sensitivity and potential exposure;

(d)     SSI's product capabilities and limitations; and

(e)     SSI employee salary information, including bonus plans, all of which is kept highly confidential.

26.     In order to protect the proprietary and confidential nature of this information, SSI closely limits access via password protected systems, non-disclosure agreements, confidentially provisions, and annual training programs.

**III.     Odello's Employment Agreement with SSI**

27.     In 2013, Odello was promoted to "VP of Sales."   An express condition of this promotion, which included a base salary increase of approximately $25,000.00 and increased bonus opportunity, as well as exposure to new confidential information and training, was that Odello needed to agree to and execute a new Confidentiality and Restrictive Covenants Agreement (the "Agreement").   Odello did so on March 6, 2013 and e-mailed the signed Agreement to SSI on March 7, 2013.   A true and accurate copy of the Agreement is attached hereto as Exhibit A.

28.     Odello specifically agreed, per Paragraph 3 of the Agreement, that there was "good, valuable and sufficient consideration" for the Agreement in the form of his continued employment, his continued access to and receipt of SSI's confidential information, and his continued receipt of valuable training provided by SSI.

29.     Paragraph 1.1 of the Agreement defines SSI's "Confidential Information" as including, but not limited to, the following information:

> [A]ll non-public confidential and proprietary information (oral and/or written) and documentation, including, but not limited to,: (i) [SSI]'s client and customer information, including, but not limited to, customer and client names, addresses, telephone numbers, fax numbers and e-mail addresses, and the names of customers' and clients' directors, officers, employees, contact personnel and agents; ( ii) all work product including, but not limited to, information relating to the negotiation of contracts, preparation of surveys, surveys, survey data and information, survey results, worksheets, interviews, tables, and related data; (iii) business practices and activities, including, but not limited to, information used by [SSI] and its employees in soliciting clients and customers, pricing and pricing practices, research, research techniques and methodology, solicitation techniques, panels, respondent communities, products, software, services, developments, processes, marketing, marketing and business plans, and finances; (iv) trade secrets, including without limitation, those within the definitions of the Connecticut Uniform Trade Secrets Act, which may include, without limitation,: (1) all software, computer programs, source code, object code, system documentation, user documentation, system designs, program materials, screen displays, documentation, data and information

regarding products or services, whether finished, under development, or being tested, whether any of the foregoing are in tangible, magnetic, digital, electronic, or other form, and (2) concepts, methods, techniques, formats, patterns, compilations, programs, devices, designs, technology, equipment, formulas, processes, packaging, testing, information, data, systems, operations, ideas, research, improvements, inventions, employee inventions, discoveries and know-how; (v) any information revealed to [SSI] by third parties under any confidentiality agreement, understanding, or duty; (vi) Inventions (as defined herein); (vii) Company Works (as defined herein): and (viii) information generally regarded as confidential in the industry or business in which [SSI] is engaged, which are or shall be owned or developed, or resulting from investigations, or work of its employees or agents, or resulting from the utilization of equipment, supplies, facilities or information, now or in the future, whether or not published, patented, copyrighted, registered or suitable therefore.

30.     Paragraph 5.1 of the Agreement prohibits disclosure or misuse of SSI's confidential information and provides:

[Odello] acknowledges and agrees that all Confidential Information is and will remain the confidential property of [SSI]. [Odello] further acknowledges that the disclosure, distribution, electronic transmission or copying of Confidential Information, outside the performance of [Odello]'s job functions, is not permitted.  Further, [Odello] covenants to neither directly nor indirectly use or make known or divulge any Confidential Information to any person, firm, corporation, company, or other entity, or the agents, heirs, or assigns thereof, including but not limited to,: (i) the print, electronic, or broadcast media, journalists, "bloggers", competitors or any other third party, for any purpose whatsoever, without the prior written consent or authorization of [SSI]'s Chief Executive Officer or (ii) outside the ordinary and proper course of [Odello]'s duties for [SSI] during [Odello]'s employment with [SSI].

31.     Paragraph 6 of the Agreement restricts the degree to which Odello would be free to compete with SSI in the event that his employment with SSI was terminated.  Paragraph 6.1 of the Agreement provides that Odello "acknowledges and agrees that the non-competition covenant contained in Section 6.2 of this Agreement: (i) is reasonable, both in the length of time and geographic scope: (ii) is reasonably necessary to protect [SSI]'s legitimate interests: and (iii)

will not prevent or prohibit [Odello] from earning a livelihood during the period of restriction set forth in Section 6.2 of this Agreement."

32.    Paragraph 6.2(ii) of the Agreement includes a one-year non-compete provision, which provides, in pertinent part:

> For a period of one (1) year after the termination of [Odello]'s employment with [SSI], for any reason, [Odello] will not directly or indirectly . . . participate in or with, whether as an employee, director, officer, agent, advisor, consultant, independent contractor, freelancer, partner, or otherwise, any company, business entity, or venture that engages in any business or business activity competitive with [SSI] or [SSI]'s business activities, including, without limitation, any entity set forth in "Exhibit A" (as amended) and/or any other entity that engages in the conduct of market research and opinion sampling, CATI services, survey programming and hosting services, access, supply, engagement and recruitment services for participation or membership in or with a panel, forum, group, and/or community or for participation in surveys, and data collection services, in any geographic area (e.g. state, province, country, and/or jurisdiction): (1), at the time of the termination of [Odello]'s employment with [SSI], in which [SSI] maintains an office or place of business or, to [Odello]'s knowledge, in which [SSI] is planning to establish an office or place of business; and/or (2) covered by or included within [Odello]'s responsibilities, activities, and/or services for and/or on behalf of [SSI], during the twenty-four (24) month period immediately preceding the termination of [Odello]'s employment. Without limiting the generality and scope of the restrictive covenant set forth in this Section 6.2.ii, and for the avoidance of doubt, "Exhibit A" to this Agreement, which is incorporated herein and made a part hereof, sets forth a non-exhaustive list of some of the competitors of [SSI] that are covered by the restrictive covenant set forth in this Section 6.2.ii.

33.    Exhibit A to the Agreement, entitled a "Non-Exhaustive List of Competitors," sets forth 19 SSI competitors with whom Odello would be prohibited from working.  Included on that list is Federated Sample, LLC, which, upon information and belief, recently rebranded as Lucid in or about August of 2015.

12

34.     In order to protect SSI's trade secrets and proprietary and confidential information, as well as its goodwill, the Agreement also restricts Odello's ability to solicit SSI's customers.  Specifically, Paragraph 7 of the Agreement provides, in pertinent part:

> [Odello] acknowledges and agrees that during [Odello]'s employment with [SSI] and for the one (1) year period following the termination of [Odello]'s employment with [SSI] for any reason, [Odello] will not individually, on behalf of, or as an employee, owner, partner, member, officer, director, agent, or contractor of, any entity . . . : (ii) encourage or attempt to encourage, or influence or attempt to influence, directly or indirectly, customers or clients of [SSI] (with whom or which [Odello] has had business contact in the two (2) year period immediately prior to the termination of [Odello]'s employment) to divert their business away from [SSI] or to limit, reduce or discontinue their business relationship with [SSI] . . . .

35.     Paragraph 7 of the Agreement further protects SSI's trade secrets and proprietary and confidential, as well as its goodwill, by restricting Odello from soliciting other employees of SSI as follows:

> [Odello] acknowledges and agrees that during [Odello]'s employment with [SSI] and for the one (1) year period following the termination of [Odello]'s employment with [SSI] for any reason, [Odello] will not individually, on behalf of, or as an employee, owner, partner, member, officer, director, agent, or contractor of, any entity . . . : (i) solicit or recruit or attempt to solicit or recruit any individual who is an employee of [SSI] or who has been an employee of [SSI] at any time within the two (2) year period immediately prior to the termination of [Odello]'s employment . . . .

36.     Finally, Paragraph 7 of the Agreement also restricts Odello from "encourag[ing] or attempt[ing] to encourage, or influenc[ing] or attempt[ing] to influence, directly or indirectly, vendors or partners of [SSI] (with whom or which [Odello] has had business contact in the two (2) year period immediately prior to the termination of [his] employment) to limit, restrict, change, or terminate their business relationship with [SSI]."

37.     Paragraph 9 of the Agreement provides, in pertinent part, that Odello "acknowledges and agrees that any equipment, materials and/or documents of [SSI], which are furnished to [Odello], including, without limitation. phones, PDAs, laptops, keys, and [SSI's] Confidential Information and all copies thereof (including both physical "hard" copies and electronic copies), shall be immediately returned to [SSI] at the earlier of [SSI's] request for return of the same, or the termination of [Odello's] employment . . ."

38.     Additionally, to protect SSI from situations such as the matter at hand, Odello agreed, per Paragraph 11.1 of the Agreement, that "in the event of a breach or an anticipated breach of this Agreement including, without limitation, [Odello's] misappropriation of Confidential Information and/or competition with [SSI] in violation of this Agreement, [SSI] may suffer irreparable injury and damage, without an adequate remedy at law.  Accordingly, [Odello] agrees that in the event of a breach or an anticipated breach of this Agreement, [SSI] may seek . . . injunctive relief (both temporary and permanent)."

39.     Odello further agreed, pursuant to Paragraph 11.1, that SSI would "not be required to post any bond or provide any indemnity in connection with the granting of [injunctive] relief."

40.     Paragraph 16 of the Agreement provides that the Agreement is "governed by, and construed and enforced in accordance with, the laws of the State of Connecticut without regard to any portion of any choice of law principles (whether those of Connecticut or any other jurisdiction) that might provide for application of a different jurisdiction's law."  That paragraph also provides that the parties agree "that any disputes or claims arising out of or resulting from this Agreement shall be subject to the exclusive jurisdiction and venue of the state or Federal courts located in Fairfield County, Connecticut USA.  The Parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts [. . .] in any such action or proceeding and

irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding."

41.     Paragraph 17.6 of the Agreement provides that "[i]n the event of a breach of this Agreement, the breaching Party shall pay to the enforcing Party all reasonable costs of enforcement, with or without suit, including reasonable legal fees, together with such other legal costs as may be authorized by law."

42.     Upon information and belief, Odello read and understood the terms of his Agreement at the time he signed the Agreement.  Indeed, Paragraph 17.7 of the Agreement provides that "BY SIGNING BELOW, [ODELLO] ACKNOWLEDGES THAT [HE] HAS READ IT CAREFULLY, UNDERSTANDS AND AGREES TO THE TERMS AND CONDITIONS SET OUT ABOVE AND HAS SIGNED THIS AGREEMENT VOLUNTARILY.  [ODELLO] MAY CONSULT WITH LEGAL COUNSEL OF [HIS] CHOICE (AT [HIS] OWN EXPENSE) REGARDING THIS AGREEMENT" (capitalization in original).

**IV.     Odello Abruptly Resigns from SSI**

43.     Upon information and belief, one of SSI's direct competitors, Lucid, extended an employment offer to Odello on or about April 14, 2016.

44.     Upon information and belief, on Monday, May 2, 2016, Odello accepted a position Lucid as "Executive Director, Business Development for Fulcrum."  Upon information and belief, "Fulcrum" is a business unit of Lucid.

45.     Later that evening, Odello called SSI's Senior Vice President of Sales, Jim Daxner, and informed him of his intent to resign from SSI.  Odello's resignation came as a total surprise to SSI and was received with no prior warning.

15

46.     On May 3, 2016, Odello sent a letter of resignation to Mr. Daxner, copying SSI's Chief HR Officer, Mary Rusterholz, and SSI's President and CEO, Chris Fanning. In his cover e-mail attaching the resignation latter, Odello informed SSI that he was "available to work this week, but understand if you choose a path of immediate termination."

47.     Ms. Rusterholz spoke briefly with Odello on the telephone that same day. It was not a formal "exit interview," but Ms. Rusterholz wanted to understand Odello's decision to leave SSI and remind him of his post-employment obligations set forth in his Agreement. Ms. Rusterholz specifically reminded Odello of his continuing non-compete, non-solicitation, and non-disclosure obligations to SSI pursuant to his Agreement with SSI, and informed him that SSI takes those obligations quite seriously.

48.     During their conversation, Odello told Ms. Rusterholz that he had "no intention" of violating any aspect of his Agreement.

49.     Ms. Rusterholz also noted during their conversation that Lucid is a direct competitor of SSI, with which Mr. Odello did not disagree.

50.     Odello was also aware, through his conversation with Ms. Rusterholz, that SSI takes the Agreement seriously and would enforce its provisions, if necessary.

51.     On May 4, 2016, SSI advised Odello that his employment with SSI was terminated, effective immediately, but he would be paid through May 6.

**V.      Odello Files Suit Against SSI in Violation of his Agreement**

52.     On May 4, 2016, just two (2) days after Odello notified SSI that he was leaving to go to work for Lucid, and in flagrant disregard of the Connecticut mandatory forum clause in the Agreement, Odello filed a declaratory judgment action against SSI in the Superior Court of California, County of Los Angeles, in the case styled as <u>Richard Odello v. Survey Sampling, International, LLC</u>, Case No. LC104141 (the "Declaratory Judgment Action").

16

53.     The Declaratory Judgment Action asks the court to hold the Agreement's non-competition provisions invalid as a matter of law.

54.     By virtue of filing the Declaratory Judgment Action, Odello has made it clear that he does not intend to abide by terms of his Agreement.

55.     Odello's filing of the Declaratory Judgment Action in California is also in direct violation of Paragraph 16 of the Agreement, which requires "that any disputes or claims arising out of or resulting from this Agreement shall be subject to the exclusive jurisdiction and venue of the state or Federal courts located in Fairfield County, Connecticut USA."

56.     Odello's decision to file the Declaratory Judgment Action outside of Fairfield County, Connecticut, as mandated by his Agreement, was clearly a premediated attempt to strip this Court of proper jurisdiction.

57.     SSI will be promptly moving to dismiss or transfer Odello's improperly filed Declaratory Judgment Action, as this contractual dispute must be resolved in Connecticut.

**VI.     Lucid's Business**

58.     Odello himself has admitted that Lucid is a direct competitor of SSI.

59.     Lucid was previously known as Federated Sample, LLC ("Federated").  In August 2015, Federated rebranded itself as Lucid.

60.     Just like SSI, Lucid (and Federated before it) is involved in the highly competitive business of market research (i.e. people answering survey questions), with offices located both in the United States and abroad.

61.     Upon information and belief, Lucid and SSI compete for business from many of the same clients and prospective clients across the globe.

62.     Because SSI always recognized Lucid as a direct competitor, it was explicitly included in the "Non-Exhaustive List of Competitors" (by its original name, Federated Sample,

17

LLC) with whom Odello agreed he could not work for if he departed from SSI.  (See Agreement, Exh. A, No. 7.)

63.     Notwithstanding his written Agreement, upon information and belief, Odello commenced employment with Lucid as of May 9, 2016 and began directly competing against SSI.

## CLAIMS AGAINST ODELLO

### COUNT I
### (Breach of Contract)

64.     SSI repeats and realleges each and every allegation contained in Paragraphs 1 through 62 of the Complaint as if fully set forth herein.

65.     Odello entered into the Agreement with SSI on March 6, 2013.

66.     The restrictive covenants contained in Odello's Agreement remain in full force and effect, and for good consideration, Odello remains obligated to comply with those restrictive covenants.

67.     SSI has satisfied all of its obligations under the terms and conditions of Odello's Agreement.

68.     Odello has breached the Agreement by accepting employment with Lucid, a direct SSI competitor, in a competitive position in violation of the express terms of his Agreement.

69.     Odello's actions have damaged SSI's goodwill, reputation, and legitimate business interests, and have denied it the benefit of its bargain with respect to Odello's Agreement.

70.     As a direct and proximate result of Odello's actions described above, SSI has suffered monetary damages, has suffered substantial and irreparable injury, and is threatened with further substantial and irreparable injury due to the loss and use by Odello of its trade secrets, confidential customer information, and its goodwill, for which there is no adequate

18

remedy at law to compensate SSI.  Such damages include without limitation SSI's lost profits and Odello's wrongful profits derived from such unauthorized disclosure and use.

71.    By reason of the foregoing, SSI requests the Court to grant preliminary and permanent injunctive relief.  SSI has no adequate remedy at law.  Unless injunctive relief is granted, SSI will be irreparably harmed in a manner not fully compensable by money damages.

72.    In the alternative, by reason of the foregoing, SSI has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, SSI respectfully requests that the Court enter Judgment:

(a)     as to Count I in SSI's favor and against Odello for all damages that may be calculated at trial suffered by SSI as a result of Odello's misconduct, plus interest;

(b)     ordering Odello to refrain from accepting or continuing employment with SSI's competitor, Lucid, for the period of one (1) year following his resignation from SSI;

(c)     ordering Odello to refrain from directly or indirectly soliciting, recruiting, or attempting to solicit or recruit SSI employees (or former employees, if they were SSI employees during the two (2) year period prior to Odello's resignation from SSI), for the period of one year following his resignation from SSI;

(d)     ordering Odello to refrain from encouraging, influencing, or attempting to encourage or influence, directly or indirectly, SSI customers or clients (with whom Odello had business contact during the 2 year period prior to Odello's resignation from SSI) to divert their business away from SSI or to limit, reduce, or discontinue their business relationship with SSI, for the period of one year following his resignation from SSI;

(e)     ordering Odello to refrain from encouraging, influencing, or attempting to encourage or influence, directly or indirectly, SSI vendors or partners (with whom Odello had business contact during the 2 year period prior to Odello's resignation from SSI) to limit, restrict, change, or terminate their business relationship with SSI, for the period of one year following his resignation from SSI;

(f)     ordering Odello to immediately return any property belonging to SSI;

20

(g)     granting Plaintiff SSI costs and expenses, including reasonable attorneys' fees; and

(h)     granting Plaintiff SSI such other and further relief as the Court deems just and proper.

**THE PLAINTIFF**
**SURVEY SAMPLING INTERNATIONAL, INC.**

By: _____

James E. Nealon, Esq. (ct08161)
Withers Bergman LLP
1700 East Putnam Avenue, Suite 400
Greenwich, CT 06870-1366
Telephone: (203) 302-4100
Facsimile: (203) 869-0558
james.nealon@withersworldwide.com

-- and --

Robert B. Milligan, Esq. (to be admitted *pro hac*)
SEYFARTH SHAW LLP
2029 Century Park East, Suite 3500
Los Angeles, CA 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219
rmilligan@seyfarth.com

Dawn Mertineit, Esq. (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, MA  02210-2028
Telephone:  (617) 946-4800
Facsimile:  (617) 946-4801
dmertineit@seyfarth.com

Eric Barton, Esq. (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
1075 Peachtree Street, NE, Suite 2500
Atlanta, GA 30309-3962
Telephone: (404) 885-1500
Facsimile: (404) 892-7056
ebarton@seyfarth.com

Dated: May 13, 2016

21

# Exhibit A

22

## CONFIDENTIALITY AND RESTRICTIVE COVENANTS AGREEMENT

THIS CONFIDENTIALITY AND RESTRICTIVE COVENANTS AGREEMENT (this "**Agreement**"), dated as of _____3/6_____, 2013, by and between Survey Sampling International, LLC, a Delaware limited liability company, with its principal place of business located at 6 Research Drive, Shelton, Connecticut 06484 USA ("**Company**") and Richard Odello, residing at 6624 Springpark Ave #3, Los Angeles, CA 90056 ("**Employee**" and Company and Employee shall individually each be referred to herein as a "**Party**" and collectively referred to herein as the "**Parties**").

WHEREAS, Company desires to continue to employ Employee to render services to Company, which employment has resulted in and will result in Employee being privy to Confidential Information (as defined herein) of Company, which is of great value to Company and must be protected from unauthorized disclosure and competitive use; and

WHEREAS, Employee desires to continue to be employed with Company, and is willing to enter into this Agreement as an inducement to Company to continue to employ Employee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.  **Definitions.**

    1.1    "**Confidential Information**": shall include, but not be limited to, all non-public confidential and proprietary information (oral and/or written) and documentation, including, but not limited to,: (i) Company's client and customer information, including, but not limited to, customer and client names, addresses, telephone numbers, fax numbers and e-mail addresses, and the names of customers' and clients' directors, officers, employees, contact personnel and agents; (ii) all work product including, but not limited to, information relating to the negotiation of contracts, preparation of surveys, surveys, survey data and information, survey results, worksheets, interviews, tables, and related data; (iii) business practices and activities, including, but not limited to, information used by Company and its employees in soliciting clients and customers, pricing and pricing practices, research, research techniques and methodology, solicitation techniques, panels, respondent communities, products, software, services, developments, processes, marketing, marketing and business plans, and finances; (iv) trade secrets, including without limitation, those within the definitions of the Connecticut Uniform Trade Secrets Act, which may include, without limitation,: (1) all software, computer programs, source code, object code, system documentation, user documentation, system designs, program materials, screen displays, documentation, data and information regarding products or services, whether finished, under development, or being tested, whether any of the foregoing are in tangible, magnetic, digital, electronic, or other form, and (2) concepts, methods, techniques, formats, patterns, compilations, programs, devices, designs, technology, equipment, formulas, processes, packaging, testing, information, data, systems, operations, ideas, research, improvements, inventions, employee inventions, discoveries and know-how; (v) any information revealed to Company by third parties under any confidentiality agreement, understanding, or duty; (vi) Inventions (as defined herein); (vii) Company Works (as defined herein); and (viii) information generally regarded as confidential in the industry or business in which Company is engaged, which are or shall be owned or developed, or resulting from investigations, or work of its employees or agents, or resulting from the utilization of equipment, supplies, facilities or information, now or in the future, whether or not published, patented, copyrighted, registered or suitable therefore. Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of Company. For the purpose of the definition of "**Confidential Information**," the term "**Company**" shall include, without limitation, Company and its parents, subsidiaries and affiliates.

    1.2    "**Inventions**" shall mean, collectively, inventions, discoveries, innovations, writings, domain names, improvements, trade secrets, mask works, ideas, concepts, designs, drawings, business processes, secret processes, know-how, materials, documentation, procedures, diagrams specifications, models, processes, formulae, source and object codes, data, programs, software, other works of authorship, developments, and techniques, in

23

each case, whether or not patentable, copyrightable, or subject to any other intellectual property protections or rights

2.      **Agreement of Company; At-Will Employment.**

2.1      In consideration of Employee's covenants contained in this Agreement and subject to the terms of Section 8 of this Agreement, Company shall continue to engage and employ Employee in accordance with the terms of Employee's offer letter and with the terms and conditions of this Agreement. Employee represents, warrants, and covenants that Employee will devote and will continue to devote substantially all of Employee's professional working time and attention to the performance of Employee's duties, services, and activities on behalf of Company.

2.2      The Parties understand that as an at-will employee, Employee's employment may be terminated by either Company or Employee at any time, for any reason or for no reason, with or without cause.

3.      **Consideration.** Company and Employee acknowledge and agree that the consideration for this Agreement and the terms contained herein, including, without limitation,:

(i)      Company's continued employment of Employee as an at-will employee,

(ii)      Employee's access to and receipt of, and continued access to and receipt of, Company's Confidential Information, and

(iii)      Employee's receipt and continued receipt of valuable training provided by or on behalf of Company.

are good, valuable and sufficient consideration for the terms, covenants, obligations, and agreements contained herein, including, but not limited to, those contained in Sections 4, 5, 6, 7, and 12 of this Agreement.

4.      **Inventions; Company Works.**

4.1      Employee shall fully and promptly disclose to Company, and Employee hereby assigns to Company as the sole and exclusive property of Company, as against the rights of any person or party including, without limitation, Employee, all rights, title, and interest in and to any and all Inventions, including, without limitation, all intellectual property and proprietary rights therein, that Employee has solely or jointly created, conceived, developed, reduced to practice, made, or authored, or that Employee may solely or jointly create, conceive, develop, reduce to practice, make or author, in each case that: (i) relate in any way to Company and/or to Company's parent, subsidiary, and/or affiliated companies and/or to any products, services, processes, plans, strategies, and/or business activities or lines of business of Company and/or of any of Company's parent, subsidiary, and/or affiliated companies; (ii) result or derive from, relate to, or are suggested by Employee's job responsibilities or duties in connection with Employee's employment; (iii) result or derive from, relate to, or are suggested by any work, assignment, project, or task that Employee is, was, or may be involved with, in any capacity, directly or indirectly, for or on behalf of Company and/or any of Company's parent, subsidiary, and/or affiliated companies; or (iv) are, were, or may be created, conceived, developed, reduced to practice, made, or authored through the use of Confidential Information, Employee's professional or working time in connection with Employee's employment, and/or any resources of Company and/or of Company's parent, subsidiary, and/or affiliated companies, including, without limitation, any computers, equipment, email systems, devices, software, technology, and/or employees, contractors, and/or consultants owned, licensed, and/or engaged or employed by Company and/or Company's parent, subsidiary, and/or affiliated companies.

4.2      Employee acknowledges and agrees that all original works of authorship and all other materials developed, made, or authored (either solely or jointly with others) throughout the duration and within the scope of duties and obligations of Employee's employment ("**Company Works**") and which are protectable by copyright are and will be "works made for hire" pursuant to the United States Copyright Act and that Company shall be the

2

24

sole and exclusive owner of all rights, title, and interest therein. If for any reason any Company Works are determined at any time not to be a "work made for hire," Employee hereby irrevocably assigns to Company, as its sole and exclusive property, all of Employee's rights, title, and interest (including, without limitation, all intellectual property and proprietary rights) in and to any such Company Works.

4.3     Employee agrees to fully cooperate with Company in securing full benefit and protection for Company in any and all Inventions and Company Works. Immediately upon request, Employee will execute all documents and take any and all other action(s) reasonably requested by Company in connection with the rights, obligations, and assignments under this Section 4, regardless of whether or not Employee is employed by Company at the time of the request, without consideration or compensation due and owing from Company.

4.4     Employee acknowledges and agrees that the terms of this Section 4 apply to any and all Inventions and Company Works developed, conceived, created, invented, made, reduced to practice, and/or authored during Employee's employment with Company and during any other period during which Employee was performing any services or activities for or on behalf of Company as a consultant, advisor, independent contractor, or any other capacity, including, without limitation, prior to the effective date of this Agreement.

5.     **Confidentiality**.

5.1     Employee acknowledges and agrees that all Confidential Information is and will remain the confidential property of Company. Employee further acknowledges that the disclosure, distribution, electronic transmission or copying of Confidential Information, outside the performance of Employee's job functions, is not permitted. Further, Employee covenants to neither directly nor indirectly use or make known or divulge any Confidential Information to any person, firm, corporation, company, or other entity, or the agents, heirs, or assigns thereof, including but not limited to,: (i) the print, electronic, or broadcast media, journalists, "bloggers", competitors or any other third party, for any purpose whatsoever, without the prior written consent or authorization of Company's Chief Executive Officer or (ii) outside the ordinary and proper course of Employee's duties for Company during Employee's employment with Company.

5.2     Employee acknowledges and agrees that Employee shall protect the confidentiality of, and take all necessary steps to prevent the unauthorized use and/or disclosure of, the Confidential Information and, to prevent it from falling into the public domain or the possession of unauthorized persons. Further, Employee covenants that during Employee's employment with Company, Employee has not and will not disclose to Company any information, to the extent that such information constitutes a protected trade secret of any prior employer, and/or that the disclosure of such information constitutes a breach of a preexisting non-disclosure and/or non-competition agreement with any third party.

6.     **Non-Competition**.

6.1     **Acknowledgments.**     Employee acknowledges and agrees that the non-competition covenant contained in Section 6.2 of this Agreement: (i) is reasonable, both in the length of time and geographic scope; (ii) is reasonably necessary to protect Company's legitimate interests; and (iii) will not prevent or prohibit Employee from earning a livelihood during the period of restriction set forth in Section 6.2 of this Agreement.

6.2     **Non-Competition Covenant.**     Employee acknowledges and agrees that during Employee's employment with Company, Employee will have or has had access to certain Confidential Information which, if provided to a competing firm would provide such firm with a competitive advantage in the marketplace. Employee further acknowledges that Company services clients nationally, regionally, and internationally. In light of the above, Employee and Company each agree that it is reasonable that:

i.     During Employee's employment with Company, Employee will not directly or indirectly own (including control of over three percent [3%] of applicable securities or membership interest), manage, operate, control, or participate in or with, whether as an employee, director, officer, agent, advisor, consultant,

3

independent contractor, freelancer, partner, or otherwise, any business entity or venture that engages in any business or business activity competitive with Company or Company's business activities, including, without limitation, the conduct of market research and opinion sampling, CATI services, survey programming and hosting, access, supply, engagement, and recruitment services for participation or membership in or with a panel, forum, group, and/or community or for participation in surveys, and data collection, in any geographic area (e.g. state, country, province, and/or jurisdiction) in which Company is doing business or, to Employee's knowledge, plans to do business.

ii.      For a period of one (1) year after the termination of Employee's employment with Company, for any reason, Employee will not directly or indirectly own (including control of over three percent |3%| of applicable securities or membership interest), manage, operate, control, or participate in or with, whether as an employee, director, officer, agent, advisor, consultant, independent contractor, freelancer, partner, or otherwise, any company, business entity, or venture that engages in any business or business activity competitive with Company or Company's business activities, including, without limitation, any entity set forth in "**Exhibit A**" (as amended) and/or any other entity that engages in the conduct of market research and opinion sampling, CATI services, survey programming and hosting services, access, supply, engagement and recruitment services for participation or membership in or with a panel, forum, group, and/or community or for participation in surveys, and data collection services, in any geographic area (e.g. state, province, country, and/or jurisdiction); (1), at the time of the termination of Employee's employment with Company, in which Company maintains an office or place of business or, to Employee's knowledge, in which Company is planning to establish an office or place of business; and/or (2) covered by or included within Employee's responsibilities, activities, and/or services for and/or on behalf of Company, during the twenty-four (24) month period immediately preceding the termination of Employee's employment. Without limiting the generality and scope of the restrictive covenant set forth in this Section 6.2.ii, and for the avoidance of doubt, "**Exhibit A**" to this Agreement, which is incorporated herein and made a part hereof, sets forth a non-exhaustive list of some of the competitors of Company that are covered by the restrictive covenant set forth in this Section 6.2.ii. Employee acknowledges and agrees as follows: (a) Exhibit A is a non-exhaustive list; (b) neither Exhibit A nor the companies listed therein shall limit or restrict the scope or enforceability of the restrictive covenant set forth in this Section 6.2.ii; (c) the companies listed in Exhibit A include, without limitation, the parents, subsidiaries, and/or affiliates of the listed companies, provided that the business activities of such parents, subsidiaries, and/or affiliates are within the scope of the restrictive covenant set forth in this Section 6.2.ii; and (d) Company shall use reasonable efforts to update Exhibit A on an annual basis, which update shall be communicated to Employee by Company in the manner determined by Company in its sole discretion; however, the failure of Company to update Exhibit A does not and will not restrict, limit, or otherwise impact or effect the restrictive covenant set forth in this Section 6.2.ii and/or Company's ability and/or right to enforce said restrictive covenant.

7.      **Non-Solicitation.** Employee acknowledges and agrees that during Employee's employment with Company and for the one (1) year period following the termination of Employee's employment with Company for any reason, Employee will not individually, on behalf of, or as an employee, owner, partner, member, officer, director, agent, or contractor of, any entity, or as an investor with over three percent (3%) of the issued securities or membership interests in such entity: (i) solicit or recruit or attempt to solicit or recruit any individual who is an employee of Company or who has been an employee of Company at any time within the two (2) year period immediately prior to the termination of Employee's employment; (ii) encourage or attempt to encourage, or influence or attempt to influence, directly or indirectly, customers or clients of Company (with whom or which Employee has had business contact in the two (2) year period immediately prior to the termination of Employee's employment) to divert their business away from Company or to limit, reduce or discontinue their business relationship with Company; or (iii) encourage or attempt to encourage, or influence or attempt to influence, directly or indirectly, vendors or partners of Company (with whom or which Employee has had business contact in the two (2) year period immediately prior to the termination of Employee's employment) to limit, restrict, change, or terminate their business relationship with Company.

8.      **No Obligation to Employ.** Employee acknowledges and agrees that Company is under no expressed or implied obligation to employ Employee, or to continue Employee's employment with Company, for any period of

4

26

time and that neither this Agreement nor any terms contained herein have or will alter or enhance Employee's status as an at-will employee.

9.     **Return of Company's Property.**     Employee acknowledges and agrees that any equipment, materials and/or documents of Company, which are furnished to Employee, including, without limitation, phones, PDAs, laptops, keys, and Company's Confidential Information and all copies thereof (including both physical "hard" copies and electronic copies), shall be immediately returned to Company at the earlier of Company's request for return of the same, or the termination of the employment of Employee. Employee further acknowledges and agrees that no such equipment, materials, documents, and/or summaries/descriptions of such equipment, materials and/or documents, including physical or electronic copies or facsimiles thereof, may be removed from the business premises (such removal to include, without limitation, physical removal, and emailing to a non-Company address or saving to removable storage devices) without the prior express written consent of an authorized representative of Company. By way of clarification, not limitation, equipment, materials, and/or documents, include, without limitation, equipment, materials, and/or documents relating to Employee's specific job related duties for Company and all Confidential Information in any form. Employee acknowledges and agrees that any equipment, materials and/or documents provided to Employee by Company shall be used exclusively for the benefit of Company, and that any personal use thereof is strictly prohibited.

10.     **Conflicts of Interest; Other Duties.**

    10.1     **Conflict of Interest.**     During Employee's employment with Company, Employee agrees that Employee has not engaged in, and will not engage in, any other employment, occupation, consulting, and/or any other service, venture, and/or activity related to, conflicting with, or in competition with the business or business activities in which Company is now involved or becomes involved during the term of Employee's employment, and nor shall Employee engage in any other activities that conflict with Employee's obligations and duties to Company.

    10.2     **Conflict with this Agreement.**     Further, Employee acknowledges and agrees that in the event that, at any time either during or after the termination of Employee's employment with Company, Employee is presented with any actual or potential conflict with the terms and intent of this Agreement, then Employee shall promptly notify Company's Chief Human Resources Officer, in writing, of such conflict of interest and shall disclose all relevant facts relating thereto. Employee agrees that he or she shall take any and all action reasonably requested by Company with respect to such conflict of interest.

    10.3     **Other duties.**     Employee acknowledges that nothing in this Agreement shall limit or restrict any fiduciary duties, duties of loyalty or other duties that Employee may owe to Company pursuant to applicable law, and Employee agrees to comply with all such duties.

11.     **Remedies and Severability**

    11.1     **Remedies.**     Employee acknowledges and agrees that in the event of a breach or an anticipated breach of this Agreement, including, without limitation, Employee's misappropriation of Confidential Information and/or competition with Company in violation of this Agreement, Company may suffer irreparable injury and damage, without an adequate remedy at law. Accordingly, Employee agrees that in the event of a breach or an anticipated breach of this Agreement, Company may seek, in addition to any and all other rights and remedies at law and/or in equity, specific performance and injunctive relief (both temporary and permanent). Nothing herein shall be construed as prohibiting Company from pursuing any and all other remedies available to Company for any breach or threatened breach. Employee agrees that Company shall not be required to post any bond or provide any indemnity in connection with the granting of relief as set forth in this Section.

    11.2     **Severability.**     In the event any section, paragraph, provision, or portion of this Agreement is or shall be deemed, by any court having lawful jurisdiction of or over the subject matter of this Agreement, to be void, voidable, or invalid for any reason, this Agreement shall be otherwise valid and enforceable as if such section, paragraph or portion of this Agreement had not been a part hereof in the first issuance. It is the intention of the Parties that, if a court of competent jurisdiction construes any term or provision contained in this Agreement, whether in whole or in part, to be invalid, illegal, void, or unenforceable, due to length of time, geographic area,

5

scope or the activity covered thereby, or any other reason(s), the court shall reduce, revise, or reform, or blue-pencil, the term or provision, to cause the term or provision to be enforceable to the maximum extent permitted under applicable law.

12.    **Non-Disparagement.**   Employee represents, warrants, and covenants that Employee has not made and will not make any knowingly false statements or comments (including, without limitation, public statements, written statements, responses to press inquiries, "blog" posts or statements to others with the intent that they be so posted, or statements in "tweets", Facebook, or other social media outlets) about or in reference to Company, its parents, subsidiaries, and/or affiliates and/or any of their respective members, managers, officers, shareholders, officers, directors, and/or employees. If Employee chooses to publicize his or her views through publicly available outlets, and/or through social media outlets, Employee is legally responsible for his or her commentary, and can be held personally liable for any commentary deemed to be defamatory, obscene, or libelous (whether pertaining to Company, or any other entity or individual), or which discloses information deemed to be Confidential Information and/or a trade secret.

13.    . **Assignment.**   Employee may not assign, directly or indirectly, any of his or her rights under this Agreement. By Employee's signature below, Employee agrees that Company may assign this Agreement and its obligations hereunder to any successor to its business by purchase, merger, consolidation, or other reorganization, or to any party acquiring all or substantially all of the assets of Company's business and Employee hereby consents to such assignment. Any assignment in violation of this Agreement shall be null, void and of no force or effect.

14.    **Waiver of Breach.**   The waiver by Company or Employee of a breach of any provision of this Agreement by the other Party shall not be construed as a waiver of any subsequent breach of the same provision or of any other provision of this Agreement.

15.    **Notices.**   All notices required or permitted hereunder shall be in writing, correctly addressed to the address(es) listed above or to such other address(es) as a Party may specify by written notice to the other Party in accordance with this Section 15, and shall be sufficiently delivered if delivered: (i) by Federal Express, Express Mail, or other nationally recognized overnight courier service (in which case notice shall be effective one (1) business day following dispatch); or (ii) by registered or certified mail, return receipt requested, postage prepaid (in which case notice shall be effective six (6) days following deposit in mail).

16    **Governing Law; Jurisdiction.**   This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Connecticut without regard to any portion of any choice of law principles (whether those of Connecticut or any other jurisdiction) that might provide for application of a different jurisdiction's law. Each Party hereby agrees that any disputes or claims arising out of or resulting from this Agreement shall be subject to the exclusive jurisdiction and venue of the state or Federal courts located in Fairfield County, Connecticut USA. The Parties hereto hereby irrevocably submit to the exclusive jurisdiction of such courts (and, in the case of appeals, appropriate appellate courts therefrom) in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding.

17.    **Miscellaneous.**

    17.1    **Entire Agreement.**    This Agreement, including all attachments and exhibits referenced herein and/or attached hereto, constitutes the entire agreement between the Parties regarding the subject matter contained herein and cancels and supersedes all prior and contemporaneous agreements, contracts, and understandings of the Parties regarding the subject matter contained herein, whether oral or written.

    17.2    **Modification.**   This Agreement may not be modified or amended, or any term or provision hereof waived or discharged, except by a written instrument signed by Employee and Company's Chief Human Resources Officer.

    17.3    **Headings.**    The headings contained in this Agreement are for reference only and shall not limit or otherwise affect the meaning or interpretation thereof.

17.4     **Counterparts; Signatures.**     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that facsimile counterpart signatures and signatures on an electronic image, file, or document (e.g. an image, file, or document in .pdf or .jpg format) shall be acceptable and deemed original signatures.

17.5     **Survival.**     The terms, covenants, obligations and agreements contained herein that by their nature and scope should survive the termination of Employee's employment with Company, including, without limitation, Sections 4, 5, 6, 7, 9, 10, 11, 12, 15, 16, and 17 of this Agreement, shall survive the termination of Employee's employment with Company.

17.6     **Legal Fees.**     In the event of a breach of this Agreement, the breaching Party shall pay to the enforcing Party all reasonable costs of enforcement, with or without suit, including reasonable legal fees, together with such other legal costs as may be authorized by law.

17.7     **Acknowledgment.** THIS AGREEMENT AFFECTS IMPORTANT LEGAL RIGHTS. BY SIGNING BELOW, EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ IT CAREFULLY, UNDERSTANDS AND AGREES TO THE TERMS AND CONDITIONS SET OUT ABOVE AND HAS SIGNED THIS AGREEMENT VOLUNTARILY. EMPLOYEE MAY CONSULT WITH LEGAL COUNSEL OF EMPLOYEE'S CHOICE (AT EMPLOYEE'S OWN EXPENSE) REGARDING THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

SURVEY SAMPLING INTERNATIONAL, LLC          EMPLOYEE

By: _____          By: _____

Print Name: Christine Coffelt          Richard Odello

Title: HR Director

<u>EXHIBIT A</u>

Non-Exhaustive List of Competitors

1.   Research Now, Inc.
2.   Toluna, Inc.
3.   CINT
4.   MarketTools, Inc.
5.   Panel Direct Online
6.   United Sample Inc. d/b/a uSamp
7.   Federated Sample, LLC
8.   Lightspeed Research
9.   ReRez, LP
10.  Luth Research Online, Inc
11.  Authentic Response, Inc.
12.  EMI – Online Research Solutions
13.  Decipher, Inc.
14.  WorldOne, Inc. d/b/a WorldOne Research
15.  EPocrates, Inc.
16.  PureProfile
17.  Reinvention, LLC
18.  InsightExpress, LLC
19.  Paradigm Sample, LLC

30